UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------X
NEIL H. ACKERMAN, Chapter 7
Trustee of Marine Risks, Inc.,                E.D. Bankr. Adv. Proc.
                                              No. 06-08416
                     Appellant,

          -against-

WALTER PILIPIAK,                              MEMORANDUM & ORDER
                                             10-CV-4851 (JS)
                     Appellee.
--------------------------------X
APPEARANCES:
For Appellant:          Kevin R. Toole, Esq.
                        Meltzer Lippe Goldstein& Breitstone LLP
                        190 Willis Avenue
                        Mineola, NY 11501

For Appellee:           John R. Keough, III, Esq.
                        Casey D. Burlage, Esq.
                        Waesche, Sheinbaum & O'Regan, P.C.
                        111 Broadway, 4th Fl.
                        New York, NY 10006

                        Tracy L. Klestadt, Esq.
                        Klestadt & Winters, LLP
                        570 Seventh Avenue, 17th Fl.
                        New York, NY 10018

SEYBERT, District Judge:

          In this bankruptcy appeal, Neil H. Ackerman

("Appellant" or the "Trustee"), the Chapter 7 Trustee of Debtor

Marine Risks, Incorporated ("Debtor" or "MRI"), challenges the

Bankruptcy Court's decision (1) denying in part the Trustee's

request to amend his Adversary Complaint against Defendant

Walter Pilipiak ("Appellee" or "Defendant") and (2) dismissing

the Complaint pursuant to Federal Rule of Civil Procedure 52 and

Federal Rule of Bankruptcy Procedure 7052 (the "Bankruptcy

Order"). Defendant cross-appeals, arguing that the Bankruptcy Court erred by amending portions of the Trustee's Complaint to conform with the evidence at trial and by not including an award of costs and fees in the Bankruptcy Order. Also pending is Defendant's Rule 11 motion to sanction the Trustee for his alleged bad faith in prosecuting this appeal.

For the following reasons, the Bankruptcy Order is AFFIRMED in its entirety and the Trustee's appeal and Defendant's cross-appeal are dismissed. Defendant's Rule 11 motion is DENIED.

<u>BACKGROUND</u>

MRI was a New York insurance brokerage, specializing in marine and automobile insurance. Bruce Keyes was its majority shareholder and, at all relevant times, a director of the company and its president. Defendant, also a shareholder, was an officer and director of MRI.

In 1997, after his responsibilities at MRI were increased to include oversight of MRI's general operations, Defendant learned that MRI was retaining premium checks belonging to MRI's clients. (<u>See</u> Bankr. Order at 7.) When Defendant confronted Keyes about his discovery, Keyes directed that false memo bills be drawn up to hide the discrepancies. <u>Id.</u> Defendant thereafter conducted an internal investigation of MRI's billing processes, eventually concluding that MRI had been

2

improperly retaining funds that belonged to its clients. Id. at 8.

In late 1997--not long after Defendant confronted Keyes about the questionable billing practices--MRI underwent a restructuring and Defendant's role in MRI's operations was reduced over his objection. Id. at 8-9. In early 1998, Defendant was interviewed by the New York State Department of Insurance about his internal investigation into MRI's billing irregularities. Id. That spring, he discussed his findings with prosecutors from the Manhattan District Attorney's office. Id. Keyes was indicted on fraud and larceny charges in November 1998, and he was arrested on November 12, 1998. Id. at 10.

In a post-indictment letter to MRI's shareholders, Keyes characterized the indictment as a grave threat to MRI's business: "At this writing, we have over 50% of our clients' renewals coming up within the next thirty days and can safely say that most, if not all, of these renewals are in serious jeopardy due solely to the criminal indictment brought by the District Attorney's office." Id. at 16 (quoting Def. Ex. W-2).

Almost immediately after Keyes was arrested, MRI's clients and other parties began contacting the company with questions. An officer of Cosmos, a rival insurance broker, called Defendant and asked whether Keyes was interested in selling MRI in light of his impending prosecution. Id. at 10.

Defendant responded that Cosmos has to speak directly with Keyes. Id.

On December 2, 1998, Keyes, who had declined his employees' pleas to step down while his prosecution was pending, told MRI's management that he planned on selling MRI's assets to a competitor, Nausch, Hogan and Murray ("NHM"). Id. at 11. Keyes said that he had agreed to the following terms of a letter of intent ("Letter of Intent") between the parties: beginning January 1, 1999, NHM would acquire all of MRI's ongoing business interests and would receive any clients that wanted to transfer from MRI to NHM. In return, NHM would pay MRI's shareholders 20% of the commissions generated by MRI's former clients for the following five years. MRI itself would receive nothing in exchange for its assets.[1] Id. 11-12.

The NHM-MRI deal was contingent on NHM's being satisfied with its due diligence on MRI. Id. at 12. Keyes signed the Letter of Intent on behalf of MRI and added "subject to shareholder approval." Id. The deal provided that NHM would hire "all key employees and branch office personnel currently employed by" MRI; Keyes explained at the meeting that Bill Murray, one of NHM's founding members, would determine which MRI employees would be kept by NHM. Id. at 13.

---

[1] According to Kevin Mullady, MRI's former vice president, had the NHM-MRI deal been finalized, MRI would have been dissolved shortly thereafter. Bankr. Order at 18.

At the December 2, 1998 meeting, Defendant told Keyes that Cosmos was interested in doing a transaction with MRI, but Keyes told Defendant that MRI would not deal with Cosmos because MRI's largest client, Nippon Express, would object. Id. at 13-14. The next day, Defendant contacted Cosmos about a job opportunity. A few days later, he offered to join Cosmos as president and as a director. As part of the employment package, Defendant offered to bring six key employees and a book of MRI's business with him to Cosmos. Id. at 15.

Between December 3 and December 21, 1998, Defendant continued to meet with MRI's clients to negotiate renewals of their insurance contracts, which were scheduled to expire at year's end. Id. at 14. According to an email between employees of ACL, an MRI client, Defendant provided ACL with a renewal contract but told ACL that he would decide shortly whether to leave MRI. The email explained that the reason for Defendant's impending decision "is that Bruce Keyes has announced the sale of [MRI] to [NHM] selling Walter down the river. Policies are in Walter's control as the Broker of Record. I have scheduled appointment here with a broker from Marsh-Sedgwick, on Wednesday: 12/9." Id. at 14 (quoting Trustee's Ex. 87). Although he had contact with MRI's clients during this time, Defendant testified that he did not advise clients that he was seeking employment with Cosmos. Id. at 17.

Defendant resigned from MRI on December 21, 1998 and began working for Cosmos on the same day.  Id.  Several MRI employees and twelve MRI clients followed Defendant to Cosmos. Although Nippon Express, MRI's largest and most important client, did not renew its business with MRI following the indictment, it did not take its business to Cosmos.  See id. at 15, 17-18.

On the same day that Defendant left MRI, NHM decided not to follow through with the proposal to buy MRI's assets. Id. at 18.  MRI's revenues for 1999 were sharply lower than those for 1998.  Keyes was convicted of fraud, and MRI officially went out of business in 2001 after its and Keyes' insurance licenses were revoked (Keyes' because of his convictions and MRI's because its license was predicated on Keyes').  Id. at 18-19.

### PROCEDURAL HISTORY

This case began when MRI filed a third-party complaint against Defendant in New York Supreme Court.  The case was eventually removed to the Southern District of New York and later closed for lack of prosecution.  In September 2005, MRI filed for Chapter 7 relief and the Trustee was appointed trustee in MRI's bankruptcy case.  This action was then re-opened and transferred to the Bankruptcy Court.  Id. at 3-4.  By the time the case was tried, the Complaint had three remaining claims:

that Defendant (1) breached his fiduciary duty to MRI by soliciting MRI's clients for his own benefit while employed by MRI; (2) breached his fiduciary duty to MRI by appropriating for his own benefit a business opportunity belonging to MRI while employed by MRI; and (3) tortiously interfered with a proposed transaction between the Debtor and a third party.[2]  <u>Id.</u> at 1. The Bankruptcy Court tried these claims without a jury over twelve days in 2009 and 2010.  <u>Id.</u> at 5.

At the close of the Trustee's case, Defendant moved for a directed verdict pursuant to Federal Rule of Bankruptcy Procedure 52.  At that point, the Trustee asked the Bankruptcy Court to amend his Complaint to reflect the trial evidence.  The Trustee was apparently not specific in his request for an amended pleading, <u>see</u> <u>id.</u> at 20 n.4, so the Bankruptcy Court construed his proposed amendments as follows: as to his first claim, (1) in addition to soliciting clients of MRI, that Defendant solicited key MRI employees for his own benefit and (2) that Defendant solicited clients and key MRI employees for the benefit of another (<u>i.e.</u>, Cosmos); as to his second claim, that Defendant breached his fiduciary duty by usurping MRI's right to enter into a deal with Cosmos.  <u>Id.</u> at 20.  Also, as to both counts, the Bankruptcy Court considered whether to amend

---

[2] A fourth claim was dismissed by the Southern District in 2003. <u>See</u> Bankr. Order at 4 n.1.

the claims to include Defendant's post-resignation conduct. Id. at 20.

The Bankruptcy Court granted in part the Trustee's request to amend the Complaint and granted Defendant's motion to dismiss the Complaint, as amended, pursuant to Bankruptcy Rule 7052. Id. at 46. The motion to amend the Complaint was granted in all respects except to the extent that it sought to include Defendant's post-resignation conduct in the allegations. This appeal followed, and Defendant then moved for sanctions under Federal Rule of Civil Procedure 11.

DISCUSSION

The Court first addresses the appeal and cross-appeal and then considers Defendant's Rule 11 motion.

## I.    The Bankruptcy Order Is Affirmed

On appeal, the Trustee argues that the Bankruptcy Court incorrectly (1) denied his motion to amend his Complaint to add allegations concerning Defendant's post-resignation conduct; and (2) dismissed the Complaint. Defendant cross-appeals, arguing that the Bankruptcy Court should not have permitted any amendments to the Trustee's Complaint and that the Bankruptcy Court erred by not awarding him costs and fees. (Def. Resp. at 33.)

Federal district courts have jurisdiction to hear appeals from final judgments, orders, and decrees of bankruptcy

judges. FED. R. BANKR. P. 8013. The Bankruptcy Court's "[f]indings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous." Id.; see also In re Momentum Mfg. Co., 25 F.3d 1132, 1136 (2d Cir. B.A.P. 1994); In re PCH Assocs., 949 F.2d 585, 597 (2d Cir. B.A.P. 1991). The Bankruptcy Court's legal conclusions, however, are reviewed de novo. See In re Momentum Mfg. Co., 25 F.3d at 1136. As the following discussion makes clear, the Bankruptcy Order must be affirmed in all respects.

    A.   Amending the Complaint to Add Post-Resignation Conduct

As an initial matter, the Bankruptcy Court did not abuse its discretion in denying the Trustee's motion to amend his complaint to include Defendant's alleged post-resignation conduct. Under Federal Rule of Civil Procedure 15(b)(2), a court must amend a pleading to include claims that were tried by the parties' express or implied consent. FED. R. BANKR. P. 7015. Here, the Bankruptcy Court did not abuse its discretion in finding that Defendant neither expressly nor impliedly consented to trying the issue of Defendant's post-resignation conduct. As the Bankruptcy Court noted, Defendant emphasized in the parties' Joint Pretrial Memorandum that the Trustee's case should be confined to Defendant's pre-resignation conduct, and Defendant objected at trial to evidence concerning the alleged post-resignation conduct. (See Bankr.) Order at 22-23. The Trustee

9

did not object to these findings, and they are not clearly erroneous. (<u>See</u>, <u>e.g.</u>, Docket Entry 1-128, Joint Pretrial Memorandum at 3 (Defendant's italicizing of "before he resigned").)

Instead, the Trustee argues that the Bankruptcy Court erred by not addressing whether Defendant would be prejudiced by the amendment. (Trustee Br. at 17.) If a motion to amend a pleading "is made during trial . . . it may be granted if the party against whom the amendment is offered will not be prejudiced by the amendment, and it should be granted in the absence of prejudice if the interests of justice so require." <u>Hillburn v. Maher</u>, 795 F.2d 252, 264 (2d Cir. 1986). The Bankruptcy Court did not expressly find that Defendant would be prejudiced by the proposed amendment, but it did not abuse its discretion in denying the Trustee's request. The Court reaches this conclusion for two reasons. <u>First</u>, the Trustee did not specify how he thought his Complaint should be amended--leaving it to the Bankruptcy Court "to determine the contours of" his proposed amendments, Bankr. Order at 20--and the Court is loath to say the Bankruptcy Court abused its discretion in denying a request that the Trustee never made. <u>Second</u>, the Bankruptcy Court could have properly found that the interests of justice did not require that the Trustee be permitted to add these allegations. As is discussed later in this Order, the

Bankruptcy Court justifiably took a dim view of the Trustee's decision to pursue this case. (See Bankr. Order at 21 n. 3 (expressing doubt that the Debtor's estate stood to gain from this lawsuit).)

## B. Rule 52 Motion

Federal Rule of Civil Procedure 52, made applicable to adversary proceedings through Federal Rule of Bankruptcy Procedure 52, provides in relevant part that, in nonjury trials, the court may enter judgment against a party if it finds that a claim "can be maintained only with a favorable finding on that issue." FED. R. CIV. P. 52(c). A judgment pursuant to Rule 52(c) is appropriate where the plaintiff fails to make out a prima facie case or where the Court determines that "the preponderance of the evidence goes against the plaintiff's claim." Matis v. United States, 236 B.R. 562, 569 (E.D.N.Y. 1999) (quotation and citations omitted). This rule "does not require that the court draw any special inferences in the nonmovant's favor, or consider the evidence in the light most favorable to the nonmoving party." Id. (quotations and citations omitted); see also Akerley v. N. Country Stone, Inc., 620 F. Supp. 2d 591, 593 (D. Vt. 2009). "Instead, the court acts as both judge and jury, weighing the evidence, resolving any conflicts, and deciding where the preponderance lies." Matis, 236 B.R. at 569 (quotations and citations omitted).

### 1. Clients and Key Employees

The Bankruptcy Court properly dismissed the Trustee's claim that Defendant breached his fiduciary duty by diverting MRI's clients and key employees to Cosmos because, among other things, the Trustee failed to prove that Defendant caused MRI any harm.  To prevail on this claim, the Trustee would have had to establish that Defendant (1) owed MRI a fiduciary duty; (2) knowingly breached that duty; and (3) caused MRI harm as a result of the breach.  See, e.g., Grund v. Del. Charter Guar. & Trust Co., ___ F. Supp. 2d ___, 2011 WL 2118754, at *16 (S.D.N.Y. May 26, 2011).  On appeal, the Trustee maintains that Defendant caused MRI to suffer financial losses by diverting its clients and poaching its employees.  The Court finds that the Bankruptcy Court's factual findings were free from clear error and that its legal conclusions were sound.  Like the Bankruptcy Court, the Court thinks that the Trustee's attempt to blame Defendant for the demise of MRI--a company whose president had been indicted for stealing from its clients and whose board was plotting to sell its assets to a competitor for no consideration--is disingenuous.  Below, the Court addresses specifically the Trustee's allegations that the Defendant diverted clients and stole top employees.

### a. Clients

The Bankruptcy Court could have properly found that

Defendant did not wrongfully divert MRI's clients to Cosmos. In his brief, the Trustee pulls together bits of circumstantial evidence that he argues compels the opposite conclusion (see Trustee Br. at 21-23); for example, he argues that an email chain from one of MRI's clients establishes that (1) Defendant falsely told the client that he was the client's broker of record (2) in order to give the incorrect impression that the client had only two choices: follow Defendant to his new company or find another broker (a time-consuming process that clients would have been reluctant to undertake as their renewals came due). (See id. at 23.) The Bankruptcy Court, however, considered these emails and reached different, entirely plausible conclusions: that although this client incorrectly thought Defendant was its broker-of-record, there was no indication that Defendant was responsible for the misimpression and that, in any event, the client was already exploring new brokers even before it learned Defendant was leaving MRI. (See Bankr. Order at 31.)

In short, the Trustee implores this Court to draw inferences that the Bankruptcy Court had good reason for rejecting. (See Trustee Br. at 23; Bankr. Order at 30-31.) Obviously, MRI's clients had plenty of incentive to take their business elsewhere: MRI's president had been indicted for stealing from clients, and MRI's management was attempting to

transfer its business to a third party. (Bankr. Order at 30.)
Further, as the Bankruptcy Court noted, there was a glaring
absence of testimony from any of MRI's former clients suggesting
that Defendant solicited their business while he was at MRI or
asked them to follow him to a new firm. (See id. at 31-32.)
This alone distinguishes this case from American Federal Group,
Ltd. v. Rothenberg, No. 91-CV-7860, 2003 WL 22349673, at *8
(S.D.N.Y. 2003), an opinion on which the Trustee relies. (See
Trustee Br. at 20.)

### b. Key Employees

The Bankruptcy Court could also have properly found
that the Trustee failed to show that Defendant harmed MRI by
taking certain "key employees" with him to Cosmos. The
Bankruptcy Court gave this aspect of the Trustee's case less
attention than it did the Trustee's client-diversion
allegations, but it nonetheless determined that the Trustee
failed to show that Defendant's conduct caused MRI any
quantifiable harm. Bankr. Order at 35-36.

On appeal, the Trustee has not pointed to anything to
suggest that the Bankruptcy Court got it wrong. Specifically,
the Trustee did not show how the departure of these employees
led to decreased revenue or some other financial harm. To the
extent the Trustee argues that the departure of these employees
prompted MRI's former clients to switch their business to

14

Cosmos, this theory is undercut by the absence of testimony from MRI's former clients.  <u>See</u> Bankr. Order at 31-32.  Further, as discussed already, MRI's former clients had ample reason to leave MRI, not least that its chief had been indicted for fraud. To the extent the Trustee maintains that the employees' departure was responsible for blowing up the MRI-NHM deal, (<u>see</u> Trustee Br. at 28), this is a dead end because the Trustee abandoned his effort to quantify the damages that MRI or its shareholders suffered when the NHM sale fell through.  <u>See</u> Bankr. Order at 35.  More to the point, there seems to be no evidence that NHM's decision not to consummate the proposed sale was prompted by these employees' departures.  In fact, one witness testified that the NHM deal died when Nippon Express--MRI's most important client--left MRI as a result of the Keyes indictment.  (<u>See</u> Def. Br. at 30.)

2. <u>Corporate Opportunities</u>

The Trustee also argues that the Bankruptcy Court erred by dismissing his claim that Defendant wrongfully usurped several corporate opportunities belonging to MRI.  The Bankruptcy Court found that the Trustee failed to prove this claim with respect to all three of the alleged "opportunities": (1) MRI's clients' renewal business; (2) the MRI-NHM deal; and (3) Cosmos's proposal to Defendant that it buy MRI's assets. <u>See</u> Bankr. Order at 37.  The Trustee devotes much of this

section of his brief to arguing that MRI had a "tangible expectancy" that its former clients would renew their policies with MRI rather than take their business to Cosmos. (See Trustee Br. at 32-33.) As discussed already, the Bankruptcy Court could have properly found that the Trustee did not prove that Defendant improperly caused MRI's clients to decamp for Cosmos. See supra 12-13.

The Bankruptcy Court also could have properly determined that the Trustee failed to establish that Defendant usurped the Cosmos and NHM deals. As to the Cosmos deal, the Bankruptcy Court found that, when he was approached by Cosmos with a proposal to buy MRI, Defendant referred Cosmos to Keyes. Defendant eventually told Keyes about his conversation with the Cosmos representative, and both Keyes and Frank Marcigliano (MRI's in-house counsel) said that a Cosmos deal was a non-starter because Nippon Express--MRI's most important client--opposed the idea. See Bankr. Order at 14, 39-40. These findings were not clearly erroneous, and they undercut any determination that Defendant somehow diverted the Cosmos deal for his own benefit. The delay in informing Keyes about the Cosmos inquiry is not an issue; had Defendant promptly told Keyes about his first conversation with Cosmos, MRI would still not have pursued the opportunity because Nippon Express remained an influential client until December 10, 1998--more than a week

after Keyes and Marcigliano cited Nippon's reluctance in rejecting Cosmos's overture. See Bankr. Order at 15.

As to the NHM deal, the Court construes this portion of the Trustee's appeal to argue that Defendant usurped the NHM deal for his own benefit by diverting MRI's clients to Cosmos, thereby causing NHM to lose interest in finalizing the transaction. This is not altogether clear from the Trustee's brief, which does not specifically refer to Defendant's alleged usurping of the NHM deal until its last page, where the Trustee writes that Defendant breached his duty "by appropriating the essential elements of the NHM Transaction." (Trustee Br. at 34.) To the extent "the essential elements of the NHM Transaction" was intended to mean MRI's former clients, the Court has already concluded that the Bankruptcy Court could have properly found that the Trustee did not prove that Defendant engaged in any wrongdoing vis-à-vis MRI's clients. See supra 12-13. To the extent, however, that the Trustee meant "essential elements" to mean that Defendant usurped the NHM deal by poaching MRI's employees, the Court notes again that the evidence showed that the NHM deal died when Nippon Express bolted for another broker. See supra 15.

C. The Trustee's Cross-Appeal is Dismissed

Defendant's cross-appeal challenges the Bankruptcy Court's decision to amend the complaint and its failure to award

Defendant his costs and fees as the prevailing party in the
adversary proceeding. (Def. Br. at 33-35.) The Court has
already concluded that the Complaint was properly dismissed,
thus the first portion of Defendant's cross-appeal is dismissed
as moot. Defendant's request for costs and fees is also
dismissed for Defendant's apparent failure to raise these issues
first with the Bankruptcy Court. See, e.g., In re Pappas, 239
B.R. 448, 454 (E.D.N.Y. 1999) (noting that, in bankruptcy
appeals, district courts do not generally address arguments that
were not initially presented to the lower court). For clarity's
sake, the Court notes that its decision here is independent from
its discussion of Defendant's pending Rule 11 motion, below.

II. The Defendant's Rule 11 Motion is Denied

    Having decided that the Trustee's appeal is meritless,
the Court now turns to Defendant's Rule 11 motion, which seeks
to impose sanctions on the Trustee for his alleged bad faith in
pursuing this appeal. Essentially, Defendant argues that the
Trustee's prosecuting this matter well past the point of
prudence, coupled with repeated attempts to mischaracterize the
bankruptcy record in his "Statement of Issues for Appeal,"
compels the conclusion that the Trustee lodged this appeal for
the sole improper purpose of twisting Defendant's arm into a
post-trial settlement. Defendant's motion is DENIED.

## A. Rule 11

Rule 11 requires that an attorney sign every pleading, written motion, and other paper filed with the courts. FED. R. CIV. P. 11(a).  By doing so, the attorney certifies

> that to the best of [his or her] knowledge, information, and belief, formed after an inquiry reasonable under the circumstances,--
>
> (1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;
>
> (2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;
>
> (3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and
>
> (4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on a lack of information or belief.

FED. R. CIV. P. 11(b).  The 1993 Advisory Notes to subsections (b) and (c) state that the rule requires "litigants to 'stop and think' before initially making legal or factual contentions" and "emphasizes the duty of candor by subjecting litigants to potential sanctions for insisting upon a position after it is no

longer tenable." FED. R. CIV. P. 11 Advis. Comm. notes (1993 Amendments). The touchstone of Rule 11 is whether an attorney's conduct was objectively unreasonable. See In re Pennie & Edmonds, LLP, 323 F.3d 86, 91 (2d Cir. 2003)

Rule 11(c), empowers the court to impose "appropriate sanctions" for violations of Rule 11(b). FED. R. CIV. P. 11(c)(1). "When a court determines that Rule 11 sanctions are appropriate, it 'has significant discretion in determining what sanctions, if any, should be imposed for a violation.'" E. Gluck Corp. v. Rothenhaus, No. 08-CV-3466, 2008 WL 2944624, at *3 (S.D.N.Y. July 31, 2008) (quoting FED. R. CIV. P. 11 Advis. Comm. Note); see also Perez v. Posse Comitatus, 373 F.3d 321, 325 (2d Cir. 2004) ("[I]f the district court concludes that the assertion of a given claim violates Rule 11 . . . the decision whether or not to impose sanctions is a matter for the court's discretion."). But any sanctions imposed "must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated. The sanction may include nonmonetary directives; an order to pay a penalty into court; or, if imposed on motion and warranted for effective deterrence, an order directing payment to the movant of part or all of the reasonable attorney's fees and other expenses directly resulting from the violation." Lipin v. Hunt, 573 F. Supp. 2d 836, 843-44 (S.D.N.Y. 2008) (quoting FED. R. CIV. P. 11(c)(4)).

B. Sanctions are not Warranted

The thrust of Defendant's motion is that the weakness of the Trustee's position, coupled with his attempt to mislead the Court in its "Statement of Issues," suggests unmistakably that the Trustee brought this appeal in bad faith. The Court disagrees. To be clear, the Court shares the Bankruptcy Court's concern that the Trustee's dogged pursuit of this action seems to have been ill-advised. As the Bankruptcy Court explained, "[t]he purpose of bringing this action seems to have been lost in the fog of litigation, but at this point, it is obvious that there is no body of creditors of the Debtor[] for whose benefit this action was prosecuted." Bankr. Order at 21 n. 3. Nevertheless, the question of whether the Trustee should be sanctioned for litigating the underlying adversary proceeding is not before the Court. The Trustee having prosecuted the adversary proceeding, the issue for the Court is whether the Trustee acted unreasonably in appealing his defeat. Although the Court found the Trustee's position on appeal extremely weak, the Trustee's arguments were not wholly devoid of evidentiary support and, in the Court's view, do not merit sanctions. See In re Carlton Concrete Corp., No. 08-CV-0242, 2008 WL 4443233, at *11 n.9 (E.D.N.Y. 2008) (declining to sanction appellant under Bankruptcy Rule 8020 because, "[a]lthough the Court finds EDS's position to be extremely weak on this appeal, EDS

attempted (albeit unsuccessfully) to cite to case authority and portions of the record that it believed supported its position"); cf. In re Negosh, No. 06-CV-5617, 2007 WL 2445158, at *6 (E.D.N.Y. 2007) (awarding sanctions under Bankruptcy Rule 8020 where appeal was "totally lacking in merit, framed with no relevant supporting law, conclusory in nature, and utterly unsupported by the evidence"). In so deciding, the Court rejects Defendant's allegations that the Trustee attempted to mislead the Court by misstating the record in his "Statement of Issues." Although perhaps awkwardly worded, the Court finds that the cited paragraphs fall far short of knowing misrepresentations.

CONCLUSION

For the foregoing reasons, the Bankruptcy Court's August 24, 2010 Order is AFFIRMED in its entirety. The Trustee's appeal and Defendant's cross-appeals are dismissed, and Defendant shall recover the costs of the appeal from the Trustee. See FED. R. BANKR. PROC. 8014. Defendant's Rule 11 motion (Docket Entry 11) is DENIED.

SO ORDERED.

/s/ JOANNA SEYBERT_____
Joanna Seybert, U.S.D.J.

Dated:     August __25__, 2011
           Central Islip, New York